2020 IL App (2d) 180100-U
No. 2-18-0100
Order filed July 15, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-129 |
| | ) | |
| ANTONIO GUTIERREZ, | ) ) | Honorable John F. McAdams, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Birkett and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In defendant's prosecution for delivery of a controlled substance based on a drug transaction with an informant, there was sufficient evidence to reject the defense that the informant was simply repaying a prior debt to defendant and received no drugs from him.  Also, the trial court did not err in denying defendant's motion for a new trial based on newly discovered evidence of allegedly deceptive conduct by the same informant, where the evidence was not conclusive and was of a character that defendant could have discovered it before trial in the exercise of due diligence.

¶ 2    In this direct appeal, defendant, Antonio Gutierrez, contends (1) that the State's evidence was insufficient to support his conviction of delivery of 15 grams or more, but less than 100 grams, of a substance containing cocaine (720 ILCS 570/ 401(a)(2)(A) (West 2014)), and (2) that the trial

court erred in denying his motion for a new trial, which was based on what defendant contended was newly discovered evidence. We hold (1) that the evidence was sufficient and (2) that the trial court did not abuse its discretion when it denied defendant's motion. Accordingly, we affirm.

¶ 3                              I. BACKGROUND

¶ 4      Defendant waived his right to a jury trial and had a bench trial on the single count of which he stands convicted. That charge stemmed from an October 30, 2014, transaction with Shane Johnson, a confidential informant, which took place in the parking lot of the Walgreens Pharmacy at the corner of Routes 47 and 34 in Yorkville, Illinois.

¶ 5                          A. The Evidence at Trial

¶ 6      At defendant's trial, the State's evidence showed that Johnson brought defendant to the attention of the Kendall County Cooperative Police Assistance Team (CPAT). Johnson, who had known defendant for roughly 20 years, suggested to CPAT officers that defendant would sell him cocaine. However, he said that defendant would be unlikely to make a sale to an undercover officer. At the inception of the operation that led to defendant's arrest, Johnson told CPAT officers that defendant had agreed to sell him an ounce (28 grams) of cocaine. The sale would take place on the afternoon of October 30, 2014. Defendant would meet Johnson at the McDonald's on Route 34 just west of the intersections of Routes 34 and 47.

¶ 7      Johnson had twice been convicted of possession of controlled substances: once in Kane County and once in Kendall County. In the Kendall County case, he was in jail awaiting trial on a charge of delivery of a controlled substance when he agreed to cooperate with CPAT in exchange for a reduction of the charge from a delivery charge to a possession charge. He also received about $1900 for his cooperation.

¶ 8    The CPAT officers met Johnson on the afternoon of October 30, 2014.  They searched him and the vehicle he was driving and fitted him with a "wire" for audio recording.  (That recording starts at 2:43 p.m.)  The searches revealed no contraband.  Johnson had $20 in cash, which an officer held for him.  Illinois State Police master sergeant Joe Stavola, the director of CPAT, gave Johnson $1000 in cash to buy cocaine from defendant.

¶ 9    CPAT officers kept Johnson's vehicle under visual surveillance after he left the initial meeting point.  Stavola saw Johnson remain in the Walgreens parking lot for 10 minutes before driving away.  Stavola followed Johnson's vehicle; his passenger, Sergeant Jurgita Jankauskaite, entered Johnson's vehicle when both vehicles were stopped at a traffic light.  Both vehicles drove to a rendezvous.  Stavola searched defendant and his car again.  The only thing of note he found was the cocaine at issue in this case.

¶ 10    Other CPAT officers maintained surveillance of defendant and his car.  Sergeant Behr Pfizenmaier of the Yorkville police entered the Route 34 McDonald's at about 2:35 p.m.  Defendant was present, sitting alone and eating.  Defendant left and drove away in a gold Toyota Camry.

¶ 11    Another CPAT officer, Bobby Richardson of the Kendall County Sheriff's Office, parked in the lot of a business behind the McDonald's to surveille defendant.  He saw a gold-colored car drive behind his vehicle and onto Center Parkway, a north-south street that intersects Route 34 west of Route 47.  The gold car crossed Route 34 at the traffic signal and entered a residential neighborhood.  Richardson did not attempt to follow, but instead drove to the Walgreens and parked in its lot.  From there, he saw the gold car reappear and "approach the stoplight at Center Parkway and 34."  It turned onto Route 34, entered the Walgreens parking lot, and parked a few spots away from Richardson's vehicle.  At that distance, Richardson could see that defendant was

the car's driver. Defendant remained in his car while Johnson approached and got into the front passenger seat. Richardson could not see what happened inside the car, but, after a few minutes, Johnson got out and returned to his vehicle. Defendant got out of his car and started walking towards the Walgreens, but turned around before he entered the store and walked over to Johnson's vehicle and spoke to him briefly. Defendant then turned and walked into the Walgreens. Johnson drove away.

¶ 12    Johnson testified that, on October 29, 2014, he spoke to defendant in person and arranged to buy an ounce of cocaine from him. He and defendant made further arrangements by text message. Defendant called Johnson on October 30, 2014, to recommend the Route 34 McDonald's as a meeting place. As Johnson was en route to the McDonald's, defendant texted him to move the transaction to the Walgreens across Route 34 from the McDonald's; Johnson texted the CPAT officers to alert them to the new location. (The CPAT officers saw his exchange of texts with defendant.) Johnson authenticated the audio recording of the transaction, identifying the voices heard during the transaction as his and defendant's.

¶ 13    The State played the full audio recording, which lasts just over 24 minutes, for the court. At the start of the recording, Johnson introduced himself as "Emilio Williams" and consented to the recording. From then until approximately minute 19, the recording reproduces unidentifiable rustling noises and identifiable sounds such as a turn signal indicator and traffic noises.

¶ 14    At around minute 19, the recorded noises change; there is pinging consistent with an open-door warning. Johnson speaks to defendant, complaining about the road construction. Johnson mentions that he has to hurry to return the car and says something of which only the word "thousand" is audible. He then says, "I might call you later for another one." Defendant says "Yup," and then something inaudible. Johnson further says, "I'll probably come tomorrow for

that party. [Inaudible] you're having a Halloween party." Defendant responds, "Tomorrow's Friday, no? Is Friday?" There is then some discussion; defendant's side is largely inaudible. Johnson says he will call defendant, and pinging sounds are heard consistent with Johnson's leaving defendant's car and getting into his vehicle. At about 20:22, defendant's voice says what sounds like, "It was what?" Johnson responds, "Thousand." Defendant then says what sounds like "By the way, it was over an ounce, right?" The words "over an ounce," although quiet, are plainly audible. Johnson says, "Yep," and "Later." Traffic noises then resume.

¶ 15   Johnson confirmed that, when he returned to his vehicle after the transaction, defendant approached the vehicle and briefly engaged Johnson in conversation. Johnson then left the area.

¶ 16   The parties stipulated that the substance Johnson brought to the CPAT officers weighed 17 grams and contained cocaine, and the State rested its case.

¶ 17   Defendant testified that he owned a company, GTZ Restoration Corp. He had known Johnson for 20 years. They met while playing pool, and Johnson had bought cars from defendant. Defendant often let Johnson pay for cars in installments. As of October 30, 2014, Johnson owed defendant money on a car. Johnson had been in prison, which had prevented him from making payments. When Johnson got out of prison, he made a few payments, and then, on October 30, 2014, Johnson offered to pay off the remaining debt. The two agreed to meet at the Route 34 McDonald's. Defendant went there and bought some food, but Johnson called him and asked to meet at the Walgreens on the other side of Route 34, so defendant drove there.

¶ 18   On cross-examination, defendant agreed that he had driven across Route 34 and into a residential area, rather than taking the direct route to the Walgreens. However, he denied that he was conducting countersurveillance; he said that he had avoided taking the left turn because road construction had made the traffic unusually bad. He accepted $1000 in cash from Johnson, but he

did not give Johnson anything, nor did he discuss giving Johnson anything. He recalled Johnson talking about "another one." He thought that Johnson, who still owed him about $1160, was talking about making more payments, and that part of the conversation confused him. He had no contact with Johnson after the transaction.

¶ 19    Defendant agreed that Johnson had visited him in person on October 29, 2014, to set up a meeting for the next day. Johnson sought him out in Earlville, where defendant then operated a restaurant. Defendant denied that Johnson had ever proposed to pay him $1000 for an ounce of cocaine. He explained that, three or four years earlier, Johnson had agreed to pay him $1500 over time for a Honda Accord that he had bought at an auction for $1300. He had also lent Johnson some gas money. However, he did not have a bill of sale for the Accord. He claimed that this was because of the high turnover of auction cars: "I used to buy those cars in auction and sometimes they don't even change the name. As soon as you get it, you sell it." He denied hearing Johnson say anything about an ounce. When defendant walked back to Johnson's car, he asked what time Johnson would be around the next day—that is, what time he would go to a party.

¶ 20    The court found defendant guilty. It did not comment on the evidence.

¶ 21                                    B. Posttrial Proceedings

¶ 22    Defendant filed a timely "Motion for a New Trial" in which he asserted that the evidence was insufficient to support the conviction. The court denied this motion on March 10, 2017. It commented that the audio recording was "[t]he major piece of evidence for me," that it had listened to it multiple times, and was persuaded of defendant's guilt by "what was said by [defendant] and by the informant." It sentenced defendant to 6 years' imprisonment, the Class X minimum, and fined him $1000, using its discretion to reduce the standard fine. Vincent Solano, who was not defendant's trial counsel, represented defendant at this hearing.

¶ 23    On April 7, 2017, defendant, now represented by Richard R. Mottweiler, filed "Defendant's Post-Trial Motion to Reconsider Sentence and for a New Trial Based upon Newly Discovered Evidence."  This motion suggested that the sentencing had been improper because Solano had failed to give the court defendant's written statement in the nature of a statement in allocution and because Solano had failed to call defendant's father.  However, the primary claim in the motion (and the only one at issue on appeal) was that defendant had new evidence to suggest that the supposed sale was a frame-up by Johnson.  Defendant had learned that, on November 13, 2014, Johnson, acting as an informant, had approached Omar Dieppa to purchase drugs.  After Dieppa accepted money from Johnson, CPAT officers arrested him.  Dieppa told his lawyers that Johnson had contacted him to offer to pay a preexisting debt.  Although counsel for Dieppa discussed this potential defense at the preliminary hearing, Dieppa ultimately entered a guilty plea. Defendant contended that this similar incident cast doubt on Johnson's reliability as an informant and requested that the court reopen discovery and hold an evidentiary hearing on Johnson's history as an informant.

¶ 24    Defendant filed his "First Amended Motion to Reconsider Sentence and for a New Trial Based upon Newly Discovered Evidence" on July 26, 2017.  In this, he added the claim that he had needed a Spanish language interpreter during his trial but that counsel had failed to arrange for one.  Further, he added a request for the court to reconsider the sentence.

¶ 25    The court held an evidentiary hearing on the motion.  Mottweiler explained Dieppa had been his client and that defendant learned of Dieppa's experience when he contacted Mottweiler for representation.    Mottweiler told the court that, considering defendant's and Dieppa's experiences together, the evidence suggested that Johnson had inflated the number of arrests produced by his cooperation with CPAT by framing his creditors.  According to Mottweiler's

theory, Johnson told CPAT officers that his creditors were willing to sell drugs, but only to him, not to undercover officers. This allowed Johnson to set up defendant and Dieppa for arrest by luring them to rendezvous with offers of repayment while persuading CPAT that drug transactions had occurred by supplying the drugs himself. Mottweiler told the court that he had spoken to as many defendants as he could find who were arrested based on alleged transactions with Johnson. Only defendant and Dieppa fit the pattern of a defendant claiming that Johnson owed them money.

¶ 26　　The State argued that the evidence of Dieppa's experience was of a character that defendant, had he been diligent, could have discovered it before his trial. The State pointed out that, on September 11, 2015, defendant's trial counsel received a list of all the cases in which Johnson was going to be a witness for the State. Those cases included the one against Dieppa and four others, including the one against defendant. Mottweiler responded that, as a practical matter, it was difficult for a defense attorney to track down all the cases related to a single informant to look for similarities.

¶ 27　　Dieppa testified at the hearing. He stated that he was in prison after having agreed to plead guilty to the delivery of a controlled substance. He had previously been in prison for five years, and shortly after his release, Johnson called him to suggest that they should meet so that Johnson could repay some of a $1800 debt. Dieppa agreed to meet with him at a Game Stop. Johnson arrived at the Game Stop's parking lot in a small sedan. Dieppa walked up to the driver's window and accepted $1400 in cash from Johnson but did not transfer anything to Johnson. As Dieppa walked away, Johnson mumbled something; Dieppa agreed that it might have been something about another transaction. Dieppa left with the money, and CPAT officers arrested him shortly after that.

¶ 28    The State introduced the audio recording of the transaction between Johnson and Dieppa. In that recording, Johnson and Dieppa confirm to one another that something is "fourteen." Johnson states that he is in a hurry; because he has "the neighbor's car." Dieppa asks when Johnson "wants to do this again." Johnson says, "Tomorrow." Johnson says that he will call "tomorrow" at "about five o'clock," but that he "might need two of them." They each say, "Later." Approximately 10 seconds later, Johnson says, "Yes, Omar sold me one ounce of cocaine."

¶ 29    On January 5, 2018, the court entered a written order denying defendant's motion. It concluded that, "based on the totality of the evidence against the Defendant," the new evidence was "not of such a conclusive character that it [would] probably change the result on retrial, nor does it warrant closer scrutiny to determine the guilt or innocence of the Defendant." The court also found that defendant spoke English well enough that an interpreter was unnecessary. Defendant filed his notice of appeal on February 2, 2018.

¶ 30                                      II. ANALYSIS

¶ 31    On appeal, defendant contends that the evidence was insufficient to support his conviction and that the court abused its discretion when it denied his motion for a new trial. The State argues that we should reject both claims on their merits.

¶ 32                          A. The Sufficiency of the Evidence

¶ 33    Defendant contends that the evidence was insufficient to sustain his conviction because the State lacked any physical evidence that he was the source of the cocaine and because the State's case was too dependent on the testimony of Johnson, an inherently unreliable witness.

¶ 34    We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237, 261 (1985): when a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is

whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "[W]here the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt," but, "[i]n conducting this inquiry, the reviewing court must not retry the defendant." *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. Although we must accord great deference to the fact finder's decision to accept testimony and must view the evidence in the light most favorable to the prosecution, the fact finder's decision is not conclusive. *Cunningham*, 212 Ill. 2d at 280.

¶ 35    Defendant asks that we apply a nondeferential standard when we consider the audio recordings of the transactions with Johnson. Our supreme court's decision in *People v. Radojcic*, 2013 IL 114197, provides some support for that suggestion. The *Radojcic* court noted that, because a trial court is in a superior position to determine the weight of the evidence and the relative credibility of the witnesses, a reviewing court must defer to such determinations. However, it held that a reviewing court and a trial court are equally positioned as to a decision based only on transcripts, so that deference to the trial court is inappropriate in such cases. *Radojcic*, 2013 IL 114197, ¶ 34. In *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29, a First District panel interpreted *Radojcic* to mean that deference is not owed to the trial court's evaluation of any evidence that "is not live testimony." In *Shaw*, the evidence in question was surveillance footage. *Shaw*, 2015 IL App (1st) 123157, ¶ 29.

¶ 36 The *Shaw* court might have overstated the appropriateness of non-deference. Here, for instance, the court had the advantage of familiarity with the voices of both defendant and Johnson. However, we need not fully resolve the issue here, as the use of nondeferential consideration does not result in a favorable outcome for defendant.

¶ 37 We conclude that the evidence here was sufficient. Reviewing the audio recording as defendant asks us to, without deference to the trial court, we conclude that the recording strongly supports defendant's guilt. As we noted, we think that the court had an advantage in reviewing the recording in that it was familiar with both defendant's and Johnson's voices. But Johnson briefly introduces himself at the start of the recording, and, in defendant's longer responses, his manner of speaking is easily recognizable; as was discussed posttrial, defendant spoke English as a second language, and that is evident in the recording. Johnson dominates the initial conversation between himself and defendant, so that portion of the exchange provides little evidence of what defendant made of Johnson's veiled suggestions of future drug transactions. However, after the brief pause, we hear defendant's voice return and ask a question about "it" being "over an ounce." That exchange is inconsistent with defendant's testimony that he gave nothing to Johnson and strongly supports the State's contention that defendant was at the transaction to deliver an ounce of cocaine.

¶ 38 Moreover, the recording is consistent with the testimony of both Johnson and Richardson, both of whom described defendant walking away from the transaction, but then returning and speaking briefly with Johnson. Further, CPAT officers searched Johnson and his vehicle before and after the transaction. And the entire surreptitious form of the transaction was more consistent with a drug deal than the legitimate repayment of a debt. We thus reject

defendant's contention that the State's evidence did not provide substantial corroboration of Johnson's testimony. We therefore conclude that, viewing the evidence in the light most favorable to the prosecution, the trial court could have rationally found defendant's delivery of the cocaine beyond a reasonable doubt.

¶ 39                    B. The Court's Denial of the Motion for a
                        New Trial Based on New Evidence.

¶ 40    Defendant asserts that the court abused its discretion when it denied his motion for a new trial. He contends that Dieppa's testimony suggested a pattern of misconduct by Johnson sufficient that it would probably change the result on retrial. The State responds that defendant's new evidence did not meet any of the criteria necessary for it to justify a new trial. The State does not raise any procedural objections to defendant's motion.

¶ 41    For a defendant to be entitled to a new trial based on newly discovered evidence, he or she must show that the evidence (1) is of such conclusive character that it would probably change the result on retrial; (2) is material and not merely cumulative, and (3) was discovered after trial and was of a character that it could not have been discovered before trial by the exercise of due diligence. *People v. Smith*, 177 Ill. 2d 53, 82 (1997). We will reverse the denial of a motion for a new trial based on newly discovered evidence only if the trial court has abused its discretion. *Smith*, 177 Ill. 2d at 82.

¶ 42    We hold that the trial court did not abuse its discretion when it found that defendant's new evidence was "not of such a conclusive character that it [would] probably change the result on retrial." Dieppa's testimony and the associated evidence were not particularly favorable to defendant. A person arrested on evidence like that used to arrest both Dieppa and defendant has a limited number of remotely plausible defenses, one of which is the one used by both Dieppa and defendant: that they took the money for a preexisting debt. Dieppa ultimately decided that defense

was insufficiently plausible and entered a plea of guilty. The audio recording of the transaction shows why he likely made that choice. Dieppa's question to Johnson about when he wanted to "do this again," and Dieppa's failure to ask Johnson about what he meant by possibly wanting "two of them," were not consistent with a person accepting a payment on a debt. Moreover, the evidence in the case against defendant was strong. We thus affirm the court's denial of defendant's motion for a new trial based on new evidence.

¶ 43 Furthermore, we agree with the State's contention that the court could have denied the motion on the basis that Dieppa's experience with Johnson was evidence of a character that it could have been discovered before trial by the exercise of due diligence. As the State pointed out, defendant received discovery documents that revealed the four other defendants—including Dieppa—in whose prosecutions Johnson was cooperating. Had trial counsel exercised due diligence in developing a defense based on the theory that Johnson had deceived CPAT by himself supplying the cocaine that he supposedly received from defendant, counsel could have interviewed the other implicated defendants to determine whether Johnson had a practice of using deceptive tactics.

¶ 44                                    III. CONCLUSION

¶ 45 For the reasons stated, we affirm defendant's conviction.

¶ 46 Affirmed.